IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

SALLY L. PATRICK                                                                PLAINTIFF

V.                          Civil No. 2:23-cv-02122-TLB-MEF

CAROLYN W. COLVIN, Acting Commissioner,
Social Security Administration[1]                                        DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Sally Patrick ("Patrick"), seeks judicial review of the final decision of the Social Security Administration denying her application for widow's disability insurance benefits under Title II of the Social Security Act ("the Act"). *See* 42 U.S.C. § 402(e). On judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the decision. *See* 42 U.S.C. § 405(g).

## I.      PROCEDURAL BACKGROUND

In September 2020, Patrick protectively applied for disabled widow's benefits and for supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 402, 1381, *et seq*. (ECF No. 10, pp. 15, 72, 74, 109-110, 130-135, 217-219, 236-245). She alleged disability since 1997 due to depression. (*Id*., pp. 15, 241). At the time of filing, Patrick was within days of turning age 54, had earned her GED, and had no past relevant work experience. (*Id*., pp. 24, 130, 217, 241). Her husband had died almost 10 years earlier, in November 2010, and previous applications for SSI benefits had been denied administratively and were pursued no further. (*Id*., pp. 77, 92, 111, 122; reflecting denials in 2011, 2012, and 2018).

---

[1] Carolyn Colvin was designated the Acting Commissioner of Social Security on November 30, 2024, and in her official capacity is substituted as defendant. *See* Fed. R. Civ. P. 25(d).

The claims Patrick filed in September 2020 were denied at the initial administrative level on May 3, 2021. (ECF No. 10, pp. 72, 74, 138-143). While these claims were pending on reconsideration, however, Patrick turned age 55, which placed her in the vocational category of "advanced age" and affected the initial SSI determination, but not the denial of disabled widow's benefits.[2] On January 10, 2022, the agency informed Patrick that, on reconsideration, it had determined her condition warranted a finding of disability, but the earliest established onset date of disability supported by the evidence in the file was September 27, 2021, the date Patrick had attained age 55.[3] (*Id.*, pp. 154-155). The agency thus informed Patrick that she satisfied the medical requirements for SSI payments, and the agency would next determine whether she also satisfied the non-medical requirements. (*Id.*, p. 154). On the same date, the agency informed Patrick that the initial decision denying her claim for disabled widow's benefits would stand on reconsideration. (*Id.*, pp. 149-152). The agency explained that the evidence in Patrick's file had not been sufficient to fully evaluate this claim; that the evidence needed could not be obtained; and that the agency had determined, based on the available medical evidence and Patrick's statements,

---

[2] Patrick's SSI claim had required her to demonstrate, *inter alia*, that her present condition was disabling on or after the filing of her application in September 2020. *See* 42 U.S.C. 1382(c)(7); *see also* 20 C.F.R. §§ 416.330, 416.335. Her claim for disabled widow's benefits, on the other hand, had required her to prove, *inter alia*, that her disabling condition had begun no later than November 30, 2017, that is, within seven years of the month in which her fully insured spouse had died. *See* 42 U.S.C. §§ 402(e)(1)(B), (e)(4); *see also* 20 C.F.R. §§ 404.335(c)(1), 404.1505(a).

[3] At the "advanced age" of 55 years or older, a person's age is considered to significantly affect his or her ability to adjust to other work. 20 C.F.R. § 416.963(e). Relevant here, a person aged 55 or older will be found unable to make an adjustment to other work if she has no previous work experience and her severe impairment or combination of impairments limits her to unskilled light work. *See* 20 C.F.R. Part 404, Subpt. P, App'x 2, Rule 202.04; *see also* 20 C.F.R. § 416.968(d)(4) (noting those who are of advanced age and limited to light or sedentary work will be found disabled if they have no transferrable skilled or semiskilled work ability).

that her condition had not been disabling on any date before her prescribed period for disabled widow's benefits had ended on November 30, 2017.[4]  (*Id*., p. 109, ¶¶ 22, 34, pp. 149-152).

Patrick requested a hearing, at which she sought to establish an earlier onset date for both claims.[5]  (ECF No. 10, pp. 39-71, 157, 160-162, 356-357, 359).  At the hearing on August 24, 2022, Patrick appeared with her attorney representative and amended the alleged disability onset date to November 30, 2017.  (*Id*., pp. 39, 41, 47, 55, 359).  On October 4, 2022, the ALJ issued a partially favorable decision.  He considered all the evidence in the record and found that although Patrick's degenerative disc disease, osteoarthritis, hypertension, depression, anxiety, and obesity were severe impairments, she did not have an impairment or combination of impairments that met or medically equaled the severity criteria for presumptive disability under the Listing of Impairments.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*., pp. 18-20).

The ALJ further determined that Patrick retained the functional capacity to perform light work, as defined in 20 C.F.R. § 404.1567(b), but with no more than occasional stooping, kneeling, crouching, and crawling; simple instructions, tasks, and work decisions; occasional public interaction, and occasional changes in the routine work setting.  (ECF No. 10, pp. 20-24).  Considering this RFC along with Patrick's age, education, and lack of work experience, and with the assistance of a vocational expert, the ALJ determined that, as of September 27, 2021, Patrick

---

[4] It is undisputed that Patrick met the non-medical requirements for disabled widow's benefits under Title II when she attained age 50 in September 2016.  However, because she did not meet the medical definition of disability until after her prescribed period for Title II benefits expired in 2017, she was not entitled to a disabled widow's benefit.  *See* SSR 18-01p, 2018 WL 4945639, at 3-5 & n.17 (explaining the method for determining the established onset date, including in cases that involve combined claims under Title II and Title XVI).

[5] Patrick's current contention that she did not seek a hearing with respect to the SSI claim is belied by, *inter alia*, her prehearing brief, in which she asserts that the onset date "for both claims should be … 11/30/2017[,]" the earliest of the two onset dates she alleged for these claims.  (ECF No. 10, pp. 359; ECF No. 12, p. 16).

was disabled by direct application of Medical Vocational Rule 202.04, and she had remained disabled through the date of the ALJ's decision.[6]  (*Id.*, pp. 12, 25-26).  *See also* 20 C.F.R. Part 404, Subpt. P, App'x 2, §§ 200.00(e); 202.00(c); *id.*, Table 2, Rule 202.04.  (*Id.*, pp. 12, 25-26).  The ALJ also determined that prior to attaining the "advanced age" of 55 on September 27, 2021, Patrick could still perform jobs that existed in significant numbers in the national economy, including light, unskilled work, such as a small products assembler (DOT No. 706.684-022); a hand packager (DOT No. 559.687-074); and an electronics worker (DOT No. 726.687-010).  (*Id.*, pp. 24-25, 66-67).  The ALJ thus found Patrick had been under a disability during the period relevant to her SSI claim, but not before September 27, 2021; therefore, he determined she was not entitled to benefits under Title II.[7]  (*Id.*, pp. 25-26).

Patrick appealed the ALJ's decision, and on August 9, 2023, the Appeals Council denied the request for review.  (ECF No. 10, pp. 1-6, 214-215).  Patrick timely filed this action for judicial review on October 13, 2023, challenging only the denial of her claim for disabled widow's insurance benefits.  (ECF No. 3, pp. 1-2).  The parties have fully briefed the issues, which are before the undersigned for report and recommendation.  (ECF Nos. 5, 12, 14).

## II.    APPLICABLE LAW

Under 42 U.S.C. § 405(g), this Court must determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole.  *Vossen v. Astrue*, 612 F.3d 1011,

---

[6] Rule 202.04 directs a finding of "disabled" for persons who are of advanced age, have a high-school education, no work experience, and are limited to light work as a result of severe medically determinable impairment(s).  20 C.F.R. Part 404, Subpt. P, App'x 2, Table 2, Rule 202.04.  *See also* SSR 83-14 (stating that when a rule directs a conclusion of "disabled" based on a person's RFC, age, education, and work experience, there is no need to consider the additional effect of any non-exertional impairment(s)).

[7] Concerning the Title XVI claim, Patrick testified at the hearing in August 2022 that she had been receiving SSI payments for "about five months."  (ECF No. 10, p. 49).

1015 (8th Cir. 2010). The threshold for substantial evidence is not high. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). It is more than a mere scintilla of evidence, but less than a preponderance, meaning it requires "only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Kijakazi*, 22 F.4th 769, 771 (8th Cir. 2022) (quoting *Biestek*, 587 U.S. at 103). "The substantial-evidence standard allows considerable latitude to administrative decision makers" and "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984). Thus, a reviewing court considers both evidence that detracts from the ALJ's decision and evidence that supports it, *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011), and if the decision is supported by substantial evidence on the record as a whole, it must be affirmed even if substantial evidence also exists for the opposite decision, *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997).

A claimant for Social Security disability benefits bears the initial burden of proving her disability. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 423(d)(5) (stating that an individual shall not be considered under a disability unless he/she furnishes such medical and other evidence of the existence thereof). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

To determine whether a claimant is disabled, the Commissioner's regulations require the application of a five-step sequential evaluation process, considering: (1) whether the claimant has engaged in substantial gainful activity since filing the claim; (2) whether she has a severe physical or mental impairment or combination of impairments; (3) whether any such impairment(s) meet or equal a listed impairment; (4) whether the claimant's limitations from her impairment(s) prevent her from performing past relevant work; and, if so, or if she has no past relevant work, (5) whether she is able to perform other work in the national economy given her age, education, work experience, if any, and residual functional capacity ("RFC").  20 C.F.R. § 404.1520(a)(4)(v).  A claimant's RFC, which is defined as the most she can do in a work setting despite her limitations, is assessed between steps three and four and is used to evaluate the disability claim at steps four and five.  20 C.F.R. § 404.1520(a)(4),(e); 20 C.F.R. § 404.1545(a).

## III.    DISCUSSION

To be entitled to disabled widow's benefits, Patrick was required to prove, *inter alia*, that she was disabled on or before November 30, 2017, which, as the undersigned has noted, marked the final date of her disability coverage based on her late husband's fully insured status.  On judicial review, Patrick challenges the ALJ's determination that, before September 27, 2021, she could perform some work.  She argues that substantial evidence does not support the ALJ's decision because the ALJ: (1) did not fully and fairly develop the record; (2) erred at step two of the sequential analysis; (3) inadequately evaluated her subjective complaints; and, as a result of the foregoing, (4) inadequately assessed her RFC.

### A.    Development of the Record

Patrick first argues that the ALJ's decision rests on an inadequately developed record relative to Patrick's physical ability to function in the workplace.  (ECF No. 12, pp. 6-11).  She

6

contends that the ALJ should have ordered a second physical consultative examination, or alternatively, he should have called a medical expert to testify, after finding the medical opinion of consulting examiner, Peggy Sue Rosson, CNP, unpersuasive.  (ECF No. 12, pp. 6-11).

Nurse Rosson conducted a physical consultative examination of Patrick in April 2021, and opined that Patrick could frequently sit, stand, and walk, and could occasionally lift and carry approximately 8 - 10 pounds, but had some postural and physical-exertion limitations due to low back pain.  (ECF No. 10, pp. 479, 484-485).   In contrast with this opinion, Nurse Rosson's objective medical findings reflected Patrick's normal strength and reflexes in all extremities and normal range of motion in all joints, including in the lumbar and cervical spine, the only exception being a slightly reduced range of forward flexion and extension in the cervical spine.  (*Id*., pp. 8-10, 21-22).   The ALJ found Nurse Rosson's medical opinion unpersuasive because it was not supported by her objective medical findings, and instead was premised on Patrick's subjective complaints, which the ALJ found were not fully consistent with the medical and other evidence. (*Id*., pp. 22-23).  *See Vance v. Berryhill*, 860 F.3d 1114, 1122 (8th Cir. 2017) (noting an ALJ may discount an opinion insofar as it rests on reasonably discredited subjective complaints); *Mabry v. Colvin*, 815 F.3d 386, 391 (8th Cir. 2016) (noting an ALJ may discount a consulting examiner's medical opinion if it is inconsistent with the rest of her medical report).

Patrick does not challenge the ALJ's finding that Nurse Rosson's opinion was unpersuasive.  (ECF No. 12, p. 8).  Rather, she contends that remand is required for further record development because, absent Nurse Rosson's opinion, the record contains no medical opinion from a treating or examining source relative to Patrick's physical ability to function in the workplace. (*Id*., pp. 8-10).  "However, there is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016).  And a "lack of medical

evidence *to support a* [*medical*] *opinion* does not equate to underdevelopment of the record as to a claimant's disability[.]"  *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (emphasis in original).  Thus, contrary to Patrick's argument (ECF No. 12, pp. 8-9, 17, 18, 20), the ALJ's duty of neutral fact development did not require that he provide a "substitute for the rejected opinion evidence" of Nurse Rosson by calling a medical expert or by ordering a post-hearing consultative examination.

Although an ALJ must ensure neutral development of the facts independent of the claimant's burden to prove disability, *see Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (stating the general rule), "'an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  *Kamann v. Astrue*, 721 F.3d 945, 950 (8th Cir. 2013) (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (1994)).  Assessment of a claimant's RFC is to be based on all the relevant evidence, including the medical records, observations of treating physicians and others, and a claimant's own description of her limitations.  20 C.F.R. § 404.1545(a)(3).  As a medical question, the RFC must be supported by some medical evidence of the claimant's ability to function in the workplace.  *Lawrence v. Saul*, 970 F.3d 989, 995 (8th Cir. 2020).  It need not, however, be supported by a medical opinion from a treating or examining source.  *See Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016) (rejecting claim of error despite no RFC opinion from a treating or consulting physician); *see also Hensley*, 829 F.3d at 932 (same).  In addition to medical records from treatment providers, an ALJ may rely on the opinions of non-examining agency physicians to support a claimant's RFC.  *See Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007).

Here, the record contained ample evidence to permit an informed decision.  The record includes the administrative medical findings of two non-examining agency doctors—Dr. Lee

Fleming and Dr. Patrick Fields—who not only reviewed Patrick's medical records, but also considered, among other things, Nurse Rosson's report. Dr. Fields additionally considered a "medium" physical RFC rating from Patrick's prior disability filing in 2012, during the prescribed period. (ECF No. 10, pp. 23, 84-86, 89-90, 124-125, 128). The record also documents the formal medical care that Patrick sought between January 4, 2010, and January 24, 2022, for depression, anxiety, obesity, hypertension, pain, and other ailments. (*Id*., pp. 38, 371-570). Further, Patrick provided informative reports in support of her claims, and she testified about the disabling nature of her health conditions. (*Id*., pp. 255-256, 277-281, 285-298, 313-315, 343, 345). She also underwent three consultative examinations at the agency's behest: a mental diagnostic evaluation performed on March 15, 2021, which included an assessment of the effects of Patrick's mental impairments on her adaptive functioning; the previously mentioned physical consultative examination on April 24, 2021; and radiologic examinations of her lumbosacral spine and left hip on November 15, 2021. (*Id*., pp. 470-478, 479-485, 499-500, 503-504).

More specifically, the medical evidence reflects that in March 2011, Patrick saw her primary care provider with complaints of increased depression and pain in her back and neck. (ECF No. 10, p. 456). She was not handling her husband's death well, and clonazepam did not seem to be helping. (*Id*.). She also indicated that cyclobenzaprine, which had previously been prescribed for back pain which she thought had been caused by heavy lifting while cleaning her home, was not helping. (*Id*., pp. 453-456). She had paracervical and lumbar tenderness, was diagnosed with major depressive disorder and second-degree burns from the use of a heating pad the previous night, and her prescriptions for clonazepam and cyclobenzaprine were discontinued. She received burn care, was prescribed diazepam, and her dosage of sertraline (brand name Zoloft) was increased. (*Id*., p. 456).

Patrick returned in August 2011 with complaints of dizziness and low back pain. She indicated her back pain would increase as the day progressed, even though she did nothing but lie in bed. Her blood pressure was 126/84, and her medications included lisinopril and propranolol. She was assessed with depression, obesity, and hypertension. Her provider recommended a mental-health consultation, weight reduction, and to hold her blood-pressure medication, monitor her blood pressure, and follow up in two months. (ECF No. 10, p. 407).

Patrick followed up for depression three months later and said she had been doing better until one of two brothers whom she had been taking care of had passed away the previous weekend. She was assessed with hypertension and depression with anxiety, and she was prescribed Effexor. She was to continue monitoring her blood pressure and taking diazepam, and she was advised to continue with her behavioral health consultation. (ECF No. 10, p. 405).

In April 2012, Patrick returned to primary care with complaints of weight gain which she said worsened her low back pain. Her review of systems indicated a depressed mood that was controlled with medication, and she was assessed with obesity and prescribed Phentermine for weight loss. (ECF No. 10, p. 403).

The following month, Patrick returned for a weight-management check. She indicated she was stressed with family visiting, that her back had been hurting for a week due to heavy cleaning, and she had not lost weight. On examination, she was tender to palpation over the paravertebral muscles. She was assessed with a muscle spasm and prescribed cyclobenzaprine (brand name Flexeril), and she was to continue to try Phentermine for one more month. (ECF No. 10, p. 401).

In November 2012, Patrick followed up for medication refills. She indicated she was doing well and was without complaints. She reported her blood pressure had occasionally been elevated, and that although she had previously been taking lisinopril and propranolol for hypertension, she

had not taken any hypertension medication for over a year. She appeared happy, indicated that she had been to a chiropractor and had her neck adjusted, her depressed mood had improved, and she had been mentally and physically more active. Her blood pressure was 152/96, and she was again assessed with hypertension and was advised to start taking lisinopril, Effexor, and diazepam. (ECF No. 10, p. 399-400). She returned for a blood-pressure check two weeks later, and the results were 112/78. (*Id.*, p. 398).

In February 2013, Patrick reported brief dizziness after rolling over in bed and walking down her hallway at home. She was stressed after finding out a family member whom she had taken in had previously molested her daughter. She was advised to continue taking her medications and to return for a blood-pressure check the following week, but there is no indication in the record that she did so. (ECF No. 10, p. 395).

In October 2014, Patrick returned to her primary care provider for medication refills. She complained of situational depression due to unspecified family issues. She had been taking her blood pressure medications as prescribed; however, a treatment note reflects concerns about non-compliance, as Patrick's pharmacist had been called and reported that the last time Patrick had filled her prescription for blood-pressure medication was in December 2013. Patrick's medications for lisinopril and diazepam were refilled at this visit. (ECF No. 10, p. 393).

On November 4, 2014, Patrick saw her primary care provider for complaints of intermittent chest pain, weakness, dizziness, and shortness of breath. She was assessed with hypertension, disorientation, an abnormal EKG, and chest pain, and she was advised to go to the emergency room. She did so and was admitted to the hospital for overnight observation. She was released the following day, and at a follow-up with primary care two weeks later, she said she felt much

better, and amlodipine, aspirin, and nitroglycerin were added to her medication regimen. (ECF No. 10, pp. 387-389, 452, 528-531, 562-565).

Medical records indicate Patrick next saw her primary care provider for symptoms of a cold in 2016. She was prescribed medication to treat her symptoms and was given "prophylactic, therapeutic" intramuscular injections in the left hip, consisting of an antibiotic and steroid. Her depression screening showed minimal depression, and her blood pressure was 114/80. During her review of systems, she indicated she had experienced a chest-pain episode several months earlier, had taken nitroglycerin, and had felt fine since. (ECF No. 10, pp. 384-385).

In July 2016, at her final primary care visit prior to the expiration of her prescribed period, Patrick reported that she was doing well, had lost 60 pounds in the previous year, and she had made herself "get out of bed and get moving" and was watching her diet. She complained of neck pain with muscle tension but had full range of motion in her neck. She also complained of worsening depression and irregular sleep and indicated she would like a prescription for Effexor, but she was not prescribed Effexor at this visit. She was assessed with hypertension and dysthymic disorder. For hypertension, she was to continue taking lisinopril, amlodipine, nitroglycerin, and aspirin, and for dysthymic disorder, she was to continue taking diazepam. (ECF No. 10, pp. 381-382).

There are no medical records following this visit in 2016 until the summer of 2019, when Patrick saw her primary care provider in June and July of 2019 for a check-up and lab work. In June, she was prescribed lisinopril-hydrochlorothiazide for hypertension, and she was referred to a community mental-health center for evaluation and treatment. (ECF No. 10, pp. 378-379). In July, she underwent lab work, and her A1C was high. Treatment notes indicate she had not heard

from the community mental-health center regarding an appointment, but she said she may have missed their call. (*Id.*, pp. 375-376).

In January 2020, Patrick returned for a follow up. She was not taking her prescribed medications and did not want to take any medication. Her blood pressure was 118/74. Her depression screening indicated moderate depression, and she was advised to continue to be seen at the community mental-health center. She was assessed with essential hypertension, unspecified depression, and prediabetes. (*Id.*, pp. 371-373).

Patrick filed for disability in September 2020, indicating that her first visit to the community mental-health center had occurred in January 2020, and that she had received counseling for depression. She reported the date of her last visit was unknown, and she did not have an appointment scheduled in the future. (ECF No. 10, pp. 243-244). The agency sought her records from the center, but on November 17, 2020, the center reported that it had no records for Patrick. (*Id.*, pp. 512-513).

On March 15, 2021, the agency arranged for Samuel Hester, Ph.D. to conduct a consultative mental-diagnostic evaluation. Patrick told Dr. Hester she had no history of inpatient mental-health treatment but had a history of outpatient mental-health treatment for most of her adult life. She was not currently in therapy due to changes in providers, and she had used coping skills which she learned in therapy to "pull herself out of her depression." (ECF No. 10, pp. 470-471). She displayed a good attitude, was appropriately dressed, groomed, had good hygiene, but she did appear slightly anxious and moved as if she was in pain. Her affect was appropriate, and her communication effective. She was alert, fully oriented, had logical thought processes, no hallucinations, delusions, bizarre obsessions, or preoccupations, but she did report suicidal ideations with no intent. (*Id.*, pp. 472-473). Simple memory testing showed Patrick had immediate

13

auditory recall of a 4-number sequence forward and a 3-number sequence backward and could retrieve various information from long-term memory. (*Id.*, p. 473). Patrick was unable to perform serial threes but was able to perform simple addition and subtraction and could count backward from 20 to 1 without difficulty. (*Id.*, p. 474). Dr. Hester assessed depressive disorder by history, panic disorder without agoraphobia, bereavement, and dependent personality traits. He also assessed a GAF score of 50 for the past year. (*Id.*, p. 474-475). With respect to the effects of Patrick's mental impairments on her adaptive functioning, he opined that she had no impairments in adaptive functioning, noting she was able to drive unfamiliar routes, to perform most activities of daily living autonomously, did her own shopping and billpaying, and participated in social groups. He noted she had the capacity to communicate and interact in a socially adequate and intelligible and effective manner, to cope with the mental demands of basic work tasks, to attend to and sustain concentration and persist in completing tasks, and that she could do so within an acceptable timeframe. (*Id.*, p. 476).

As noted, Nurse Rosson performed Patrick's consultative physical examination on April 24, 2021. Patrick reported she had struggled with depression since her husband's death, and she also struggled with obesity, low back pain, and neck/shoulder pain. She said she had problems with pain and muscle spasms in her back and neck, but she currently took no medications. (ECF No. 10, p. 479). On examination, she was cooperative, alert, and fully oriented, in no acute distress, and showed no observable symptoms of a mood disorder. (*Id.*, p. 480). No muscle spasm or tenderness was observed on examination of her back, and her straight-leg raise test was normal in both a seated and supine position. (*Id.*, p. 481). She demonstrated 2+ reflexes and full strength bilaterally in her grip and in her upper and lower extremities. She demonstrated normal tandem walking and normal walking on her heels and toes, but she indicated heel and toe walking caused

low back pain.  She had a "waddling" gait and was unable to squat and rise due to instability, poor balance, and low back pain, but she was able to get on and off the examination table with no difficulty.  (*Id*., p. 482).  She demonstrated normal range of motion in all joints and in the lumbar and cervical spine, the only exception being a slightly reduced range of forward flexion and extension in the cervical spine.  (*Id*., pp. 8-10, 21-22).  She indicated pain with range of motion in her shoulders and spine.  (*Id*., p. 482-483).

On May 3, 2021, Lee Fleming, M.D., a non-examining physician, reviewed Patrick's pain and function forms and the medical evidence dating from 2010 to 2021, including Nurse Rosson's general physical examination.  He concluded Patrick's allegations of functional limitations were not fully consistent with and supported by the evidence of record, and that she could perform a full range of light work.  He further concluded, pursuant to Regulation Basis Code F2 and 20 C.F.R. § 404.1516, that there was insufficient evidence to rate the Title II prescribed period of November 18, 2010, to November 30, 2017.  (ECF No. 10, pp. 84-86, 89-90).

On July 13, 2021, Patrick presented to primary care for a checkup.  She had not been taking her medication as prescribed, had not taken any medications for a long time, but had been told she "could not get social security."  (ECF No. 10, p. 489).  Her depression screening indicated moderately severe depression, and she indicated she had been experiencing anxiety while caring for her mother and was unable to work due to anxiety.  She was assessed with hypertension, prediabetes, and depression with anxiety.  Her prescriptions for lisinopril and diazepam were refilled, and she was to begin taking Lexapro; however, there is no evidence in the record that she did so, and when she next visited her primary provider in January 2022, she was noted to be taking no medications.  (*Id*., pp. 489-491).

In the interim, on August 16, 2021, in response to the state agency's second request for Patrick's mental-health records dating from November 2016 to the present time, the community mental-health center again reported it had no records for Patrick.  (ECF No. 10, pp. 513-514).

On November 15, 2021, Patrick underwent a consultative examination which involved imaging of her left hip and her lumbar spine.  The imaging of her left hip indicated only mild osteoarthritis; and the imaging of her lumbar spine indicated no acute osseous abnormality, but mild degenerative changes were present, including osteophytes throughout the lumbar spine and facet arthropathy at L5-S1.  (ECF No. 10, pp. 499-500).

On December 7, 2021, agency medical consultant, Patrick Fields, M.D., considered the medical and other evidence of record, including a prior filing in 2012 in which Patrick was rated at a medium level of exertional work.  He noted Patrick's established impairments of obesity, hypertension, chronic pain, degenerative disease of the lumbar spine, and osteoarthritis of the left hip, but he concluded, pursuant to Regulation Basis Code F2 and 20 C.F.R. § 404.1516, that the available medical evidence of record prior to the end of Patrick's Title II prescribed period was insufficient to rate her physical impairments.  (ECF No. 10, pp. 113-114).

On January 24, 2022, Patrick returned to primary care for a six-month follow up.  She still was not taking her medications and indicated increased anxiety due to parental caregiving and financial troubles.  She reported that trying to get disability had been stressful, but she was able to cope with it fairly well.  She underwent lab work and was to follow up in six months.  (ECF No. 10, pp. 521-524).

Upon careful consideration of such evidence, the undersigned concludes Patrick was not deprived of a full and fair disability determination.  Considered as a whole, the record contained the evidence necessary for an informed decision, and no crucial issue was rendered undeveloped

by the rejection of Nurse Rosson's medical opinion.  In fact, in formulating Patrick's RFC, the ALJ considered "the entire record," as required.  (ECF No. 10, p. 20).  In doing so, he expressly relied on Nurse Rosson's objective medical findings pertaining to Patrick's physical function.  (*Id*., pp. 22-23).  Although the ALJ found Nurse Rosson's medical *opinion* was unpersuasive because, *inter alia*, it was not supported by her objective medical findings, the lack of evidence to support an opinion is not tantamount to a failure to develop the record.  *Martise*, 641 F.3d at 927.

Nor was the ALJ required to consult a medical expert to determine Patrick's RFC.  The ALJ had sufficient contemporaneous evidence—dating from both before and after November 30, 2017—to determine, on the whole, that Patrick was not disabled prior to September 27, 2021, and, hence, was not disabled prior to the expiration of her prescribed period of coverage.  *See Rodriguez v. Berryhill*, 763 F. App'x 585, 585-587 (8th Cir. 2019) (per curiam) (applying predecessor to SSR 18-01p, and holding medical advisor was unnecessary to infer onset date where ALJ considered contemporaneous medical records, including records from earlier period, and concluded the evidence on the whole supported later date of onset); *Titus v. Berryhill*, No. 4:18-cv-03188-DGK-SSA, 2019 WL 2994209, at 2-3 (W.D. Mo. July 9, 2019) (same).  *See also Grebenick v.* Chater, 121 F.3d 1193, 1201 (8th Cir. 1997) (applying predecessor to SSR 18-01p and holding where medical evidence was not ambiguous as to possibility that claimant's disability onset occurred before claimant's date last insured, the ALJ was not required to consult a medical advisor).

The record was fully and fairly developed and presents no ambiguity as to Patrick's established onset date.  The undersigned finds no error on this point.

### B.    Step Two Analysis

Patrick next argues that the ALJ erred at step two because he did not explicitly account for evidence relevant to Patrick's mental impairments, specifically a global assessment of functioning

("GAF") score of 50 and "dependent personality traits" which were assessed by Dr. Hester in March 2021.[8]  Relatedly, Patrick suggests that, when assessing the severity of her mental impairments, the ALJ should have considered the formal personality disorder associated with dependent personality traits.  (ECF No. 12, pp. 11-13).

At step two of the sequential evaluation process, the ALJ must determine whether a claimant has "a severe medically determinable physical or mental impairment" or "a combination of impairments that is severe," and which has lasted or is expected to last at least 12 months.  20 C.F.R. §§ 404.1520(a)(4)(ii),(c); 404.1509.  A medically determinable impairment is one that results "from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques" and "must be established by objective medical evidence from an acceptable medical source."  20 C.F.R. § 404.1521.  A diagnosis or medical opinion is not sufficient.  *Id*.  Further, a medically determinable impairment is "severe" if it more than minimally affects the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  If the impairment or combination of impairments "would have no more than a minimal effect on the claimant's ability to work," then it will not satisfy the threshold severity requirement at step two.  *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).

---

[8] The Global Assessment of Functioning (GAF) scale represents a clinician's judgment of an individual's "overall level of functioning on a hypothetical continuum of mental health-illness" ranging from 1 to 100.  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision, at 16 (2022) (internal quotations omitted).  Although the GAF scale has been replaced by a different measure in the current diagnostic manual, *id.*, the GAF scale is still used by clinicians, and for disability claims filed on or after March 27, 2017, the Social Security Administration instructs adjudicators to consider GAF ratings as "other medical evidence" in the evaluative process.  *See* Soc. Sec. Admin., AM-13066 REV 2 - Global Assessment of Functioning (GAF) Evidence in Disability Adjudication (June 28, 2017); *see also* 20 C.F.R. § 404.1513 (defining "other medical evidence").

The ALJ considered "the entire record" and found that Patrick suffered from severe mental impairments of depression and anxiety. (ECF No. 10, p. 18). Contrary to Patrick's argument, the ALJ considered her mental impairments both "singly and in combination" when assessing severity. (*Id*., p. 19). Although the ALJ's severity analysis does not explicitly mention the GAF score that Dr. Hester assigned to Patrick for the year preceding March 2021, or the dependent personality traits he assessed, this does not mean, as Patrick assumes, that the ALJ failed to consider this evidence at step two or at any other step of the sequential analysis. "[A]n ALJ is not required to discuss all the evidence submitted, and [his] failure to cite specific evidence does not indicate that it was not considered." *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000).

In fact, the ALJ carefully considered Dr. Hester's detailed report of Patrick's March 2021 mental diagnostic evaluation. (ECF No. 10, p. 23). In doing so, the ALJ not only expressly considered Patrick's diagnosis of "dependent personality traits[,]" but he also considered Dr. Hester's related observation that, since the loss of her husband, Patrick was beginning to feel more secure with access to her mother and brother. (*Id*.) Dr. Hester noted that he had not observed sufficient criteria to support a diagnosis of dependent personality disorder, but he assessed dependent personality traits, explaining that Patrick had never worked outside the home, was passive and dependent, and had lost two husbands, but she now had access to her mother and brother, which made her feel more secure. (*Id*., pp. 470-471, 474).

Notwithstanding his assessment of dependent personality traits and the GAF score of 50, Dr. Hester offered his clinical opinion that Patrick's impairments did not result in significant functional limitations related to the basic mental demands of work. (ECF No. 10, pp. 475-476). Specifically, Dr. Hester noted that Patrick could drive unfamiliar routes, could autonomously perform most activities of daily living, did her own shopping and billpaying, and participated in

social groups. (*Id*., p. 475). He further noted that Patrick had the capacity to communicate intelligibly, effectively, and to interact in a socially adequate manner, to cope with the mental demands of basic work tasks, and to attend and sustain concentration on basic work tasks, persist in completing them, and to do so within an acceptable timeframe. (*Id*., p. 476). The ALJ found Dr. Hester's opinion persuasive because it was consistent with his clinical evaluation and the balance of the evidence in the record. (*Id.*, p. 23).

Given the ALJ's discussion of Patrick's dependent personality traits and his reliance on the results of Dr. Hester's evaluation—including Dr. Hester's clinical opinion that Patrick's mental capacity for work was not significantly limited—the undersigned finds no reversible error in the ALJ's step-two analysis on these points. It is evident that the ALJ expressly considered Patrick's dependent personality traits, and it is implicit in his consideration of Dr. Hester's report that he also considered the GAF score in his step-two severity assessment. *See Bradley v. Astrue*, 528 F.3d 1113, 1115 n.3 (8th Cir. 2008) (rejecting argument that the ALJ failed to consider GAF score, noting that the ALJ necessarily considered the score, given that it was part of the physician's overall assessment considered by the ALJ); *see also Craig*, 212 F.3d at 436 (stating "given the ALJ's explicit reliance on some of Dr. Cobb's conclusions, we find it highly unlikely that the ALJ did not consider and reject those portions of his report that Craig now points to in support of her appeal"); *Welsh v. Colvin*, No. 4:13-cv-3187, 2014 WL 7272659, at 12-13 (D. Neb. Dec. 18, 2014) (noting GAF score was implicitly considered because the score was included in a physician questionnaire that was discussed by the ALJ).

Regarding Patrick's suggestion that the ALJ should have considered dependent personality disorder in the severity analysis, the undersigned also finds no reversible error. Patrick did not allege dependent personality disorder as a severe impairment in her disability application or at the

hearing. (ECF No. 10, pp. 39-71, 241). Further, Dr. Hester expressly noted that he had not observed the necessary criteria to diagnose dependent personality disorder, and he did not do so. (*Id.*, p. 256). Absent objective medical evidence documenting the clinical diagnosis of and treatment for dependent personality disorder during the relevant period, the undersigned finds the ALJ did not err by failing to identify or consider this disorder at step two. *See* 20 C.F.R. § 404.1521 (an impairment "must be established by objective medical evidence from an acceptable medical source"); *see also Marolf v. Sullivan*, 981 F.2d 976, 978 (8th Cir. 1992) (proof of a disabling impairment must be supported by at least some medical evidence).

Further, Patrick makes no meaningful argument that she was prejudiced by the omission of this impairment at step two. (ECF No. 12, pp. 11-12). She makes only a passing reference to the relevant listing for dependent personality disorder—Listing 12.08—and does not contend that she satisfied all of its criteria. (*Id.*, p. 12). The undersigned notes that non-examining psychological consultant, Dr. Kevin Santulli, did consider Listing 12.08 at the administrative level, and he determined that Patrick did not satisfy the required Paragraph A and B criteria. (ECF No. 10, pp. 82-83). The ALJ found that Patrick suffered from severe mental impairments at the step-two threshold and performed the psychiatric review technique, and he considered all the medical evidence and all of Patrick's impairments at step three. (*Id.*, p. 19). Listings 12.04 and 12.06 were among those the ALJ considered, and each of these Listings utilize the same paragraph B criteria as Listing 12.08; therefore, they entailed the same analysis of Patrick's work-related mental limitations.[9] (*Id.*, p. 18). *Compare* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04 and 12.06, *with id.*, 12.08. The ALJ found Patrick did not satisfy these criteria, and Patrick's suggestion that

---

[9] Unlike Listing 12.08, Listings 12.04 and 12.06 also require satisfaction of the Paragraph C criteria. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04 and 12.06.

her lone GAF rating of 50 satisfied both the Paragraph B and C criteria is unconvincing in the light of the record evidence, most notably Dr. Hester's own description of Patrick's work-related abilities.[10]  (*Id.*, p. 19; ECF No. 12, pp. 11-12).  On this record, the undersigned finds there would be no harm from a failure to address Listing 12.08, had the ALJ been obligated to do so.  *See Mark v. O'Malley*, 2024 WL 340736, at 6-7 & n.3 (E.D. Mo. Jan. 30, 2024) (noting failure to find an impairment severe at step two may be harmless where the ALJ continues with the sequential evaluation process and considers all impairments, both severe and non-severe); *Summers v. Kijakazi*, No. 4:21-CV-1390-ACL, 2023 WL 2707442, at 6 (E.D. Mo. Mar. 30, 2023) (same); *Gibbs v. Kijakazi*, No. 4:21-CV-00127-KGB, 2022 WL 4299732, at 1-2 (E.D. Ark. Sept. 19, 2022) (same).  There was no reversible error at step two.

### C.   Subjective Complaints

Patrick next contends that the ALJ improperly discounted her subjective complaints of disabling impairment.  (ECF No. 12, pp. 14-16).  She maintains the ALJ relied "almost wholly upon the lack of objective findings," and that he improperly weighed her daily activities and failed to provide a robust discussion of them with pinpoint citations to the record.  (*Id.*, pp. 15-16).  "Generally, an ALJ's failure to adequately explain his factual findings is not a sufficient reason for setting aside an administrative finding."  *Vance*, 860 F.3d at 1122 (internal quotation and citation omitted).  An ALJ's reasoning need only be "clear enough to allow for appropriate judicial

---

[10] Patrick's lone GAF score of 50 was on the border of the "moderate" and "serious" points on the published GAF continuum.  *See* American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision, at 34 (2000) (noting ratings of 41 to 50 represent "[s]erious" symptoms or impairments in functioning in social or work domains, and ratings of 51 to 60 represent "[m]oderate" symptoms or impairments. *Id.*  As previously discussed, Dr. Hester's adaptive-functioning assessment provided helpful context for understanding his rating of Patrick's overall level of functioning.

review." *Grindley v. Kijakazi*, 9 F.4th 622, 631 (8th Cir. 2021) (internal quotation and citation omitted). And although an ALJ may not discount a claimant's subjective complaints solely because they are not substantiated by the objective medical evidence, the extent to which such evidence supports the degree of symptom severity alleged by the claimant is a relevant factor to be considered. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

The ALJ must consider the claimant's subjective complaints in relation to all the evidence, including the claimant's prior work record, the objective medical evidence, and other evidence from both medical and non-medical sources. *Polaski*, 739 F.2d at 1322; *see also* Social Security Ruling ("SSR") 16-3p, "Evaluation of Symptoms in Disability Claims," 2017 WL 5180304, at 4 (Oct. 25, 2017). The ALJ's evaluation of this evidence is guided by the consideration of several factors relevant to symptom severity, such as the duration, frequency, and intensity of the symptoms; what precipitates or aggravates them; the medications, treatments, or other methods that have been used to alleviate them; and how the symptoms affect the claimant's pattern of daily living. *See Polaski*, 739 F.2d at 1322; *see also* 20 C.F.R. § 404.1529(c).

The ALJ noted Patrick's subjective complaints that she experienced disabling musculoskeletal pain in her back, neck, and hip, and that she had long experienced stress, anxiety, and depression, which affected, for example, her memory, her desire to socialize and engage in activities, including self-care, and her ability to pay attention and to complete tasks. (ECF No. 10, pp. 19-22, citing to pp. 257-266, 285-298). The ALJ determined, however, that Patrick's statements concerning the disabling intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the record evidence considered as a whole. (*Id.*, p. 21).

Relevant to the duration, frequency, and intensity of Patrick's symptoms, as well as the treatment and medications she used to alleviate them, the ALJ initially considered Patrick's

longitudinal treatment record, which included objective signs and findings, and treatment notes documenting not only the observations of Patrick's providers but also her own statements concerning the nature of her symptoms and her prescribed treatment for pain, hypertension, and depression with anxiety.  (ECF No. 10, pp. 19, 21-22).  First, the ALJ considered that Patrick's prescribed treatment plan for these impairments was conservative in nature, consisting predominantly of medication and some outpatient therapy, with no need for surgical or aggressive interventions, or extensive inpatient hospitalization.  (ECF No. 10, pp. 21-22).  Conservative treatment is a factor that may undermine a claim of severe disabling conditions.  *See Swarthout v. Kijakazi*, 35 F.4th 608, 612 (8th Cir. 2022).

Regarding Patrick's pain, for example, the ALJ considered that over the span of several visits to primary care between 2010 to 2016, Patrick subjectively reported musculoskeletal pain in her back and neck, and variously associated it with weight gain, lying in bed all day, and to certain activities, such as heavy cleaning.  (ECF No. 10, p. 21; *see also id.*, pp. 401, 403, 407, 438, 443, 453-456).  As the ALJ noted, Patrick's providers documented only tenderness to palpation of muscles over the spine and prescribed the muscle relaxant cyclobenzaprine (brand name Flexeril).  (*Id.*, pp. 21, 401, 407, 438, 453-456).  The ALJ further noted that Patrick reported to her provider, in November 2012, that she had seen a chiropractor for a neck adjustment.  (*Id.*, pp. 21, 399).  At this visit, Patrick also reported she had been more active mentally and physically, had lost 60 pounds in the previous year, and that she had made herself "get out of bed and get moving" and was watching her diet.  She complained of neck pain with muscle tension but had full range of motion in her neck.  (*Id.*, p. 400).  And records from subsequent visits in July 2016 and July 2019 document some subjective neck pain with muscle tension, but full range of motion in the neck and no formal treatment for pain management.  (*Id.*, pp. 375, 381-382).

The ALJ also considered Patrick's reports of symptoms relative to depression, anxiety, and hypertension during the foregoing and other encounters with primary care between 2010 and 2021. (ECF No. 10, pp. 21-22). Specifically, the ALJ noted Patrick's reports that following her husband's death she lay in bed most days, with little interest or pleasure in activities, little energy, difficulty concentrating, and difficulty with sleep. (*Id*., pp. 21, 443, 456). He further considered Patrick's reports of increased symptoms in 2011, 2013, 2014, 2021, and 2022, due to situational stressors involving family issues, such as the death of a brother, learning that her daughter had been molested as a child, and becoming a caregiver for her mother. (*Id*., pp. 21, 393, 395, 405, 489, 521). As the ALJ noted, however, Patrick's pursuit of care for anxiety and depression was modest, as were her complaints of symptoms, and the prescribed treatment for these impairments was conservative. (*Id*., p. 21, 22).

Patrick was treated with medication: initially Zoloft in 2011, and later, Effexor and diazepam during and after the prescribed period. She later was prescribed Lexapro in 2021, after complaints of increased anxiety due to caregiving and financial stress, and a depression screening which indicated thoughts of self-harm with no specific plans. (ECF No. 10, pp. 393-394, 399, 401-402, 405, 489-491). Her primary-care provider also referred her to a community mental-health center for outpatient therapy in June 2019, but in July 2019, she indicated she had not yet begun counseling. (*Id*., pp. 379, 413-414). A later treatment record dated January 16, 2020, indicates that Patrick reported she was seeing a mental-health provider at the community mental-health center one or two times a month. (*Id*., p. 371). Consistent with this record, in her disability papers dated October 23, 2020, Patrick stated that her first visit to the community mental-health center had occurred in January 2020. She reported, however, that the date of her last visit was unknown, and she did not have an appointment scheduled in the future. (*Id*., pp. 243-244). In her

hearing testimony, Patrick said she had attended only three or four appointments in 2020, and that she informed her attorney, in August 2021, that she had returned to outpatient counseling at the center at that time. (*Id*., pp. 51-53). The ALJ credited Patrick's testimony that she had participated in some outpatient therapy. (*Id*., p. 22). He noted, however, that the record contains no medical evidence of formal mental-health therapy in the 5 - 10 years preceding the decision, and only a few primary-care visits in which Patrick's depression was specifically addressed. (*Id*.). As previously noted, the community mental-health center twice indicated it had no records for Patrick, and her counsel provided no records demonstrating Patrick's formal mental-health treatment despite having been given the opportunity to do so following the hearing. (*Id*., pp. 34, 44-46, 512-513, 520-521). A lack of consistent ongoing treatment is inconsistent with allegations of disabling symptoms. *See Buford*, 824 F.3d at 796-96 ("lack of consistent ongoing treatment" is proper consideration when assessing subjective complaints); *Renstrom v. Astrue*, 680 F.3d 1057, 1567 (8th Cir. 2012) (same).

The ALJ also considered that Patrick's hypertension was treated initially with a regimen of lisinopril and propranolol, with amlodipine, nitroglycerin, aspirin added in 2014, after an overnight hospital stay for monitoring in November 2014 due to complaints of chest pain and abnormal EKG results. Hydrochlorothiazide was added in 2019, and the ALJ noted that, by July 2021, Patrick reported she was not taking her medication, and her blood pressure at that visit was 146/90. (ECF No. 10, pp. 21, 414, 418). An ALJ may properly consider the claimant's failure to take prescription medications when assessing the consistency of her complaints of disabling symptoms. *Choate v. Barnhart*, 457 F.3d 856, 872 (8th Cir. 2006).

Although Patrick argues her limited pursuit of treatment and her failure to take medication at times was justified by economic conditions, there is no evidence in the record to indicate she

sought to obtain low-cost treatment or that she had been denied further treatment or access to prescription medication on account of financial constraints.  *See Clark v. Shalala*, 28 F.3d 828, 830 n.4 (8th Cir. 1994) (affirming denial of claim, noting that although economic justifications for the lack of treatment can be relevant to disability determination, claimant offered no testimony or evidence to indicate she was denied treatment on account of financial constraints); *Murphy v. Sullivan*, 953 F.2d 383, 386-387 (8th Cir. 1992) (fact that claimant is under financial constraints is relevant but not determinative).  Further, Patrick's various accounts of the reasons she did not take medications did not hinge on affordability.  Although she indicated in her hearing testimony and disability papers that affordability was an issue, she also indicated that she did not want to take medications because she had witnessed her husband take "up to 100" hydrocodone every day before he passed away, that she choked when simply taking Tylenol, feared addiction, and she did not want to take medication someone else might need.  (ECF No. 10, pp. 51, 58-59, 256, 259).  She also indicated she did not seek more treatment because she did not like people and did not know she could get health-insurance under the Affordable Care Act.  (*Id*., pp. 63-64).  Presented with this evidence, the ALJ could reasonably determine that Patrick's financial hardship was not sufficient justification for her inconsistent treatment.  *See Clark*, 28 F.3d at 830 n.4.

In addition to the conservative nature of Patrick's treatment, the ALJ also considered the objective medical imaging and examination findings, which he noted were inconsistent with Patrick's reports of disabling pain and dysfunction.  (ECF No. 10, pp. 22-23).  *See also* 20 C.F.R. § 404.1529(c)(2).  He considered that Patrick underwent no diagnostic imaging until November 2021.  (*Id*., p. 22).  Even then, the results showed only mild degenerative changes in Patrick's lumbar spine and mild osteoarthritis in her left hip.  (*Id*., pp. 499, 503-504).  The ALJ also considered examination findings made during the prescribed period, indicating only muscle

tenderness in Patrick's back, and examination findings made years later, during Patrick's physical consultative examination in 2021, which showed only somewhat limited range of motion in her cervical spine, and full range of motion in her lumbar spine and all joints.  (*Id*., pp. 482-484).

Additionally, the ALJ considered that Patrick's daily activities were inconsistent with her claims of disabling impairment prior to September 27, 2021.  (ECF No. 10, p. 22).  She was able to go out alone, drive, shop independently, handle light household chores, and prepare simple meals.  (*Id*., pp. 259, 260, 291-293, 475).  Although she limited her social activities, she had no problems getting along with others, including authority figures, spent time with others in person and by texting, and she attended church most Sundays, where she said she was able to sit, sing, pray, and hug others.  (*Id*., 259, 260-262, 291-293).  She indicated some difficulty paying attention, but she reported no problems following instructions and said she worked on puzzles, could etch glass, color, paint small images, and read books.  (*Id*., pp. 261-262, 289, 293).  She also could handle financial transactions and had lived both independently and with her mother, for whom she was a caregiver.  (*Id*., pp. 132, 257, 260, 285, 292, 475 521).

The consistency of a claimant's subjective complaints is primarily for the ALJ to decide, not the courts.  *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005).  Here, the ALJ considered relevant factors and gave good reasons, which are supported by substantial evidence, for partially discounting Patrick's claimed symptoms.  As such, the Court finds no error and defers to the ALJ's evaluation of Patrick's subjective symptoms relative to the weight of the medical and other evidence.  *See Guilliams v. Barnhart*, 393 F.3d 798, 801-02 (8th Cir. 2005).

### D.    RFC Determination

Patrick next challenges the ALJ's determination that, prior to September 27, 2021, she had the RFC to perform a reduced range of light, unskilled work, with only occasional stooping,

kneeling, crouching, and crawling, and only occasional public interaction and changes in the routine workplace setting.  Noting that both agency doctors concluded the medical evidence was insufficient to rate her impairments during the prescribed period ending on November 30, 2017, Patrick insists that, absent Nurse Rosson's medical opinion, there was no evidence that addressed her physical ability to function in the workplace.  The undersigned disagrees.

Contrary to Patrick's argument, the ALJ did not impermissibly draw his own medical inference from the records to determine her RFC.  A claimant's RFC presents a medical question, and an ALJ's finding must be supported by some medical evidence of the claimant's ability to function in the workplace.  *Lawrence*, 970 F.3d at 995.  The ALJ, however, "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence."  *Guilliams*, 393 F.3d at 803.  When evaluating the relevant evidence, the ALJ may properly conclude that objective medical findings and other evidence constitute sufficient medical support for an RFC finding, even in the absence of any medical opinion evidence directly addressing the claimant's ability to function in the workplace.  *See Hensley*, 829 F.3d at 929-34 (finding "adequate medical evidence of [the claimant's] ability to function in the workplace" where treating doctor noted claimant was in no acute distress and had a normal knee exam and gait, another physician noted a normal knee assessment, with "full knee range, good lower limb and spinal flexibility," and claimant reported reduced knee and back pain after treatment); *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (affirming RFC based on generally mild or normal objective findings regarding claimant's back condition, even though medical evidence was "'silent' with regard to work-related restrictions such as the length of time she [could] sit, stand and walk and the amount of weight she [could] carry"); *Kamann*, 721 F.3d at 951 (affirming physical RFC for light exertional work based on medical examinations suggesting good range of

29

motion and strength in upper extremities, no spinal abnormalities other than mild scoliosis, and a gait that showed only some stiffness in the lower back). Further, administrative findings made by reviewing agency physicians may be relevant even if they are made after the expiration of a claimant's prescribed period of coverage. *See Pyland v. Apfel*, 149 F.3d 873, 877 (8th Cir. 1998) (evidence of disability after claimant's last-insured date can be relevant in helping to elucidate medical condition during earlier time for which benefits might be awarded).

As discussed in the previous section, the evidence of record does not support Patrick's contention that the ALJ's RFC determination is flawed. Regarding Patrick's physical impairments, the medical records reflect few complaints of musculoskeletal pain during the prescribed period and only limited and conservative treatment for it. Patrick complained of pain in her back or neck twice in 2011, twice in 2012, and once in 2016, just over a year prior to the expiration of the prescribed period. In March 2011, she was advised to use Silvadene to treat burns to her back and neck from use of a heating pad, was noted not to be tender in the cervical and lumbar spine; in August weight loss was recommended after she complained of low back pain. (ECF No. 10, pp. 456, 407). In April 2012, she was prescribed Phentermine for weight loss after complaints of back pain that was worsened by weight gain. (*Id.*, p. 403). The following month she was assessed with a muscle spasm in her back caused by heavy cleaning. She was prescribed Flexeril and was advised to continue taking Phentermine for another month to assist with weight loss. (*Id.*, p. 401). At a check-up four years later, in July 2016, Patrick indicated neck pain with muscle tension, but she had full range of motion in her neck and received no treatment for pain. At this encounter, she also reported she had lost 60 pounds and had made herself "get out of bed

and get moving[.]"[11]  (*Id.*, p. 381).  The record reflects only four subsequent visits to primary care, all after the expiration of the prescribed period: twice in 2019, once in 2020, and once in 2022. Patrick did not seek treatment for musculoskeletal pain at any of these visits.  Although her review of systems in July 2019 was positive for neck pain, examination findings at this visit and at the remaining three visits reflect full range of motion in her neck and coordinated movement of all extremities.  (*Id.*, pp. 375, 379, 382, 385).

In addition to the foregoing evidence, Nurse Rosson documented largely normal findings upon examining Patrick in 2021, including no deformity, muscle spasm, or tenderness in her back, and normal straight-leg raise tests; normal strength in all extremities; normal tandem walking; normal walking on heels and toes, but with complaints of low back pain; normal range of motion in all joints and in the lumbar and cervical spine, except slightly reduced range of flexion and extension in the cervical spine, indications of pain with range of motion in her shoulders and spine, and difficulty squatting and rising due to instability and low back pain.  (ECF No. 10, p. 481-484). Non-examining physician, Lee Fleming, M.D., subsequently assessed Patrick's impairment, and after reviewing all evidence of record in May 2021, including Patrick's pain and function forms, her treatment records dated from 2010 to 2021, and the report of Nurse Rosson's general physical examination, he concluded that Patrick could perform a full range of light work.  (*Id.*, pp. 84-86, 89-90).  Consistent with this assessment, subsequent radiological examinations in 2021 were

---

[11] Although the ALJ indicated that Patrick had been given a steroid injection for hip pain in February 2016, the record of this visit indicates that Patrick was seen for symptoms related to a cold and, in addition to various prescriptions to treat symptoms related to sinusitis and right otitis media, was given "therapeutic, prophylactic" intramuscular injections in the left hip, consisting of the antibiotic, Clindamycin, and the steroid Decadron.  (ECF No. 10, pp. 21, 384-385).  It does not appear Patrick mentioned experiencing hip pain at any medical encounter other than her mental-diagnostic evaluation with Dr. Hester in 2021.  (*Id.*, p. 470).

31

interpreted as showing only mild osteoarthritis in Patrick's left hip and mild degenerative changes in the lumbar spine. (*Id.*, pp. 499-500).

The ALJ further considered Patrick's statements relative to physical abilities, including that she could drive, shop for herself, and tend to light household chores. (ECF No. 10, p. 22). While these activities, standing alone, would not suffice to prove she could perform competitive work prior to September 27, 2021, when considered with the foregoing objective and other medical evidence, including signs, findings, and observations of Patrick's providers and her own reports to those providers, the undersigned concludes that the evidence, on the whole, provides substantial support for the ALJ's determination that Patrick could perform a reduced range of light exertional work with only occasional stooping, kneeling, crouching, and crawling.

Regarding the ALJ's assessment of Patrick's mental limitations, Patrick acknowledges that the ALJ gave significant weight to Dr. Hester's findings and found his clinical opinion persuasive; however, she again contends that the ALJ disregarded Dr. Hester's assessment of dependent personality traits, and she newly argues that he also disregarded Dr. Hester's assessment of panic disorder. (ECF No. 12, p. 17). Patrick is mistaken. As previously discussed, when formulating Patrick's RFC, the ALJ expressly acknowledged Dr. Hester's assessment of dependent personality traits and his related observations that Patrick expressed increased feelings of security with access to her mother and brother. (ECF No. 10, pp. 23, 470-471, 474). The ALJ also considered Dr. Hester's assessment of panic disorder without agoraphobia when formulating Patrick's RFC. He acknowledged Dr. Hester's note that Patrick had reported a history of panic attacks with shortness of breath, palpitations, nausea, and feeling the need to flee, as well as her report that she was feeling more secure with access to her family. (*Id.*, pp. 23, 470-471). Notwithstanding his diagnoses, Dr. Hester opined that Patrick was not significantly limited in basic mental demands of work, and there

is no indication in Dr. Hester's report, or the broader evidence of record, that Patrick is more limited than either Dr. Hester or the ALJ determined her to be.

As the ALJ noted, the evidence of record reflects sparse and conservative treatment for mental impairments prior to September 27, 2021, with no medical evidence documenting formal therapy. (ECF No. 10, pp. 21, 22). As previously discussed, Patrick admitted, and the medical evidence shows, that she did not consistently take her prescribed medication for anxiety and depression; and she conceded attending very few therapy sessions, stating she had attended only three to four sessions sometime around 2020, and that she told her attorney she had returned to therapy in August 2021. (*Id.*, pp. 51-53, 58, 256, 259, 280). The ALJ further observed that Patrick's complaints of symptoms during the prescribed period were intermittent and largely related to family stressors that were situational in nature. (*Id.*, pp. 21, 22). Records of these and other visits to primary care indicate that, over the course of her treatment, Patrick also indicated improvement in her symptoms. Records reflect, for example, that she had been doing better before one particularly distressing event, that her symptoms were controlled with medication, that she was doing well and was without complaints, appeared happy, was more active mentally and physically, and that her depressed mood had improved. (*Id.*, pp. 381-382, 399-400, 403, 405). And in March 2021 she reported using coping skills which she learned in therapy to "pull herself out of her depression." (*Id.*, pp. 470-471).

In addition to the foregoing evidence, the ALJ further considered Patrick's statements in disability reports and Dr. Hester's clinical findings and opinion. After reviewing Patrick's medical history and performing a structured interview which included limited testing, Dr. Hester considered the effects of Patrick's mental impairments and opined that she had no significant impairment of adaptive functioning in any domain, including in the performance of her daily

activities, social interaction and communication, coping with the mental demands of basic work tasks, attending and sustaining concentration on basic tasks, persisting in the completion of tasks, and completing work tasks within an acceptable timeframe.  (ECF No. 10, p. 476).  Dr. Hester provided detailed support for each of these conclusions, and the ALJ found the opinion persuasive because it was supported by the clinical findings and observations as well as the medical evidence.  (*Id*., p. 23).  Further, the ALJ considered Patrick's mixed statements concerning the effects of her mental impairments and, on balance, credited her statements that she experienced difficulties relevant to the mental demands of work.  (*Id*., pp. 19-20).  Based on his consideration of all the evidence, the ALJ determined that, prior to her established onset date, Patrick's mental impairments limited her to work involving only simple instructions, tasks, and decisions, and only occasional interaction with the general public and changes in the routine work setting.  (*Id*., p. 20).  Particularly in the light of the limited treatment Patrick sought, and the conservative nature of such treatment, as well as her statements and Dr. Hester's opinion concerning her mental limitations, the undersigned finds that the evidence of record provides substantial support for the ALJ's determination that, prior to the established onset date, Patrick retained the mental capacity for unskilled work, with additional limitations.

The ALJ properly performed the sequential analysis, and there is substantial evidence in the record to support the determination that, prior to her established onset date, Patrick was not disabled within the meaning of the Act.

## IV.    CONCLUSION

For the reasons and upon the authorities discussed above, it is RECOMMENDED that the Commissioner's decision be affirmed, and that Patrick's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 3rd day of January 2025.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE